IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JACK W. LOGSDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3522-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jack Logsdon seeks review of the final decision of the Commissioner of Social
Security denying plaintiff's application for disability benefits under Titles II and XVI of the
Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to give controlling
weight to the opinion of Janie Vestal, M.D., a treating physician who completed a Medical
Source Statement - Mental. I find that the substantial evidence in the record as a whole
supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for
summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On June 4, 2009, plaintiff applied for disability benefits alleging that he had been
disabled since January 31, 2006. Plaintiff's disability stems from a mood disorder, emphysema,
depression and anxiety. Plaintiff's application was denied on July 29, 2009. On June 13,
2011, a hearing was held before an Administrative Law Judge. On September 12, 2011, the
ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 15,
2012, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the
ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Terri Crawford, in addition to documentary evidence admitted at the hearing and after a post-hearing consultative examination.

A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

Earnings Record

The record shows that plaintiff earned the following income from 1983 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1983 | $ 146.01 | 1997 | $ 679.56 |
| 1984 | 141.75 | 1998 | 5,257.43 |
| 1985 | 723.00 | 1999 | 5,274.04 |
| 1986 | 0.00 | 2000 | 13,826.50 |
| 1987 | 0.00 | 2001 | 3,594.13 |
| 1988 | 0.00 | 2002 | 744.41 |
| 1989 | 0.00 | 2003 | 4,935.00 |
| 1990 | 0.00 | 2004 | 2,094.96 |
| 1991 | 0.00 | 2005 | 13,025.42 |
| 1992 | 0.00 | 2006 | 1,598.63 |
| 1993 | 5,625.09 | 2007 | 0.00 |
| 1994 | 3,343.92 | 2008 | 0.00 |
| 1995 | 7,172.22 | 2009 | 0.00 |
| 1996 | 0.00 | 2010 | 0.00 |

(Tr. at 157).

School Records

On October 29, 1981, plaintiff was in seventh grade (Tr. at 210).  His school records list a verbal IQ score of 80, a performance IQ score of 81, and a full scale IQ score of 79 as of September 28, 1981, pursuant to the Wechsler Intelligence Scale for Children - Revised.  His

reading recognition, reading comprehension and math were above present grade-month placement (Tr. at 211).

**Disability Report - Field Office**

On June 5, 2009, L. Lanza met face to face with plaintiff in connection with his disability claim and observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands or writing (Tr. at 165-168). Plaintiff was described as cooperative.

**B.     *SUMMARY OF MEDICAL RECORDS***

Plaintiff received his treatment through the Department of Corrections between 2006 and 2008.  An individual is not eligible for supplemental security income benefits for any month during which he is a resident of a public institution, i.e., prison. See 20 C.F.R. § 416.211.

Plaintiff's alleged onset date is January 31, 2006.

On March 30, 2006,[1] plaintiff had an intake psychiatric evaluation (Tr. at 221-222). Plaintiff was taking Xanax, Prozac and Elavil which he had taken since November 2005 when he lost his fiancé and step kids "per order of DFS."  He also got fired from his job for arguing with someone at work.  He said he had only slept a total of five hours during the five days he had been incarcerated.  Plaintiff reported a history of drug abuse but said he stopped using drugs 10 to 12 years ago.  Plaintiff was incarcerated due to a conviction for child abuse.

Plaintiff's memory was intact, he was oriented times four, he was described as intelligent and was able to communicate fully.  He had poor insight and judgment.  Plaintiff

---

[1]The prison medical records are confusing in that they each contain two dates. Although one date may be the request date and the other the actual appointment date, this is not indicated on the record.  Therefore, the dates used in this order may not be completely accurate, and I note that the same records are sometimes referred to by the parties as having occurred on different dates.

was assessed with anxiety disorder, depressive disorder not otherwise specified,[2] and "legal and financial stressors" with a GAF of 50.[3] Plaintiff was restarted on Elavil (antidepressant) and Prozac,[4] and his Xanax was changed to Vistaril (both treat anxiety but Xanax is a controlled substance), and he was prescribed Amitriptyline (antidepressant) for insomnia.

On April 6, 2006, plaintiff attended group therapy, participated appropriately, was not disruptive, and showed no evidence of mental health distress (Tr. at 224-225).

On April 18, 2006, plaintiff attended group therapy, participated appropriately, was not disruptive, and showed no evidence of mental health distress (Tr. at 225).

On April 27, 2006, plaintiff had a follow up and said that he was "still depressed some" (Tr. at 225-226). His appetite was adequate, sleep was adequate, mood was appropriate and stable, he had no anxiety, his cognitive ability was intact, he was able to control and direct his thoughts, reality testing was intact, he had no hallucinations or delusions. Plaintiff indicated satisfaction with his current medications. Dr. Sutikant observed that plaintiff's mood was euthymic.[5] He was assessed with anxiety disorder and depressive disorder not otherwise specified. His Prozac dose was increased.

On May 11, 2006, plaintiff reported that his medications may be causing his jaw to lock (Tr. at 227). He was observed to be alert and oriented, his mood and affect were normal,

---

[2]This designation abbreviated NOS can be used when the mental disorder appears to fall within the larger category but does not meet the criteria of any specific disorder within that category.

[3]I note that plaintiff stated in his brief that he was assessed a GAF of 50 "because he was functioning marginally." There is nothing in this medical record stating that plaintiff was functioning marginally.

[4]Selective serotonin reuptake inhibitor ("SSRI") used to treat anxiety and depression.

[5]Pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated.

he has no suicidal or homicidal ideations, his thought processes were logical and goal directed, he showed no psychotic or manic symptoms. His GAF was 70.

On May 17, 2006, plaintiff said his medication was working and his jaw was better (Tr. at 227-228). He was observed to be alert and oriented to all spheres, eye contact was appropriate, hygiene and grooming were good, speech was normal, mood and affect were congruent, he was calm and pleasant, he had no suicidal or homicidal ideations, thought processes were logical and goal directed, and he had no psychotic or manic symptoms.

The following day, plaintiff reported he was doing well and his anxiety had improved (Tr. at 228). His mental exam was entirely normal. He was diagnosed with adjustment disorder with anxiety with a GAF of 70.

On June 2, 2006, plaintiff saw Dr. Barone, a psychiatrist, at the prison clinic (Tr. at 229). Plaintiff had just gotten out of administrative segregation. He complained of the Elavil burning his mouth but had no other complaints. "The patient would like to stay on the very same meds." Dr. Barone observed no signs of psychosis or mania. He diagnosed adjustment disorder with anxiety and assessed a GAF of 66.

On June 13, 2006, plaintiff said he was fine and that his psychiatric medications were "working fine" (Tr. at 230). He was observed to be cooperative and had an appropriate affect.

On June 14, 2006, plaintiff again reported that he was doing fine and had no issues (Tr. at 230). He was taking his medication as prescribed.

On June 28, 2006, plaintiff reported hearing high pitched noises or cricket sounds (Tr. at 230, 232). The doctor noted that these are possible side effects of plaintiff's medication. His Elavil was discontinued. "I go home [on] parole in July 06 and I am not even excited about leaving." He was assessed with depressive disorder not otherwise specified.

The following day plaintiff complained about not having gotten much sleep the past few days (Tr. at 234). He said he had run out of Elavil; however, that prescription had been discontinued the day before. "He is hopeful he will be able to get the medication back again."

On July 1, 2006, plaintiff saw a new doctor, David Hunter, M.D., and reported no mood swings (Tr. at 233). He said it was hard to go to sleep and he was still hearing the cricket sounds. He reported being unable to feel pleasure and said that his anxiety was back. He was observed to be alert and oriented times three, his speech was clear and detailed. He was assessed with depressive disorder not otherwise specified with a GAF of 45.

On September 21, 2006, plaintiff was observed to be oriented times three with adequate reality testing (Tr. at 237). He denied hallucinations and delusions. His speech was logical, coherent, goal directed and free of loose associations and perceptual distortions. He reported some symptoms of depression and anxiety. Plaintiff said he had last taken his medication three weeks earlier when his medications were lost at the Kansas City Community Release Center.

On October 4, 2006, plaintiff had an intake screening (Tr. at 237-238). He reported that he had been on Remeron (antidepressant) and Vistaril (a antihistamine used to treat anxiety) but those had been stolen at the Kansas City Community Release Center. "At any rate he has not taken anti-depressants for almost one month, is becoming symptomatic for mood disorder." His previous drug usage included alcohol, marijuana, methamphetamine and cocaine. He last used cocaine one and a half months earlier, but he said alcohol was his drug of choice. He denied mental health distress or concerns. His mental status exam was normal except his mood was described as depressed and affect flat. He said he felt hopeless which was noted to be consistent with a depressive disorder.

On October 6, 2006, plaintiff saw Dr. Sutikant (Tr. at 238-239). Plaintiff reported that he had been serving a 120-day shock time earlier in the year, was released in July and his probation was revoked for paraphernalia. "His life has not changed. He wishes to be maintained on the same medications." Dr. Sutikant observed that plaintiff's mood was euthymic, his affect was congruent, he had an intact memory, he was oriented times four, he was noted to be intelligent and well articulate. He had no delusions, no hallucinations, no suicidal or homicidal ideations. "He has fairly good insight and intact judgment." He was assessed with anxiety and depressive disorder not otherwise specified with a GAF of 50. Dr. Sutikant kept plaintiff's medications the same. "He cries frequently but has not taken meds for a month now."

On October 16, 2006, plaintiff denied problems (Tr. at 240). He denied hallucinations or delusions, he was alert and oriented times four.

On October 18, 2006, plaintiff said he was doing OK, he denied any problems with Remeron or Vistaril (Tr. at 240). He denied depressed mood and reported good appetite and sleep.

On October 25, 2006, plaintiff met with Jada Jesse (Tr. 240-241). He reported that he was arrested for domestic assault in Indiana, battery in California, and child abuse which caused his current incarceration. Plaintiff was noted to be cooperative and pleasant with a stable mood, no signs or symptoms of depression or anxiety. His thoughts were organized and logical, he had good eye contact and a positive attitude with no suicidal or homicidal ideation. He was assessed with history of mood disorder not otherwise specified and history of substance abuse.

On December 5, 2006, plaintiff saw Agara Reddy, M.D., for psychiatric care (Tr. at 241). He reported "doing OK." He denied depressed mood or suicidal ideation. He denied any

problems with his medication and said his appetite and sleep were good. Dr. Reddy observed that plaintiff's mood was mildly dysphoric and his affect was normal. He assessed mood disorder not otherwise specified and continued plaintiff on his same medications.

On February 7, 2007, plaintiff met with Jeanine Benac (Tr. at 243). He requested an appointment with the doctor for a medication adjustment. He said he was being transferred soon. He reported that his sleep pattern was "all messed up" and he was feeling depressed. He was observed to appear sad but his mood was appropriate.

On February 9, 2007, plaintiff saw Dr. Reddy (Tr. at 244). He said he could not sleep and was anxious at times. He denied hopelessness and reported good appetite. Dr. Reddy observed that plaintiff's mood and affect were normal. He assessed mood disorder not otherwise specified. He increased plaintiff's Remeron.

On February 14, 2007, plaintiff met with Jeanine Benac for group therapy (Tr. at 242-243). Plaintiff said he was having symptoms of panic and paranoia and wanted to isolate himself at times. He was hearing whispers that no one else could hear. "He stated that he is leaving any day now to go to St. Joe." Plaintiff said he would consider taking an anti-depressant but he could not take Prozac or Elavil because they cause increased panic, although he was given those medications earlier this year without complaints of increased panic. Plaintiff participated "very well" in the group which lasted 60 minutes and despite having seen a doctor the previous week he asked to see the doctor again before he leaves. Plaintiff was alert and oriented times four. "He stated that he was very depressed but his mood and affect did not display this. He was talkative and exhibited smiling behavior. Stated he felt embarrassed about having mental health issues."

On February 26, 2007, plaintiff saw Thomas Copeland (Tr. at 244-245). Mr. Copeland noted that plaintiff was alert and oriented, and he denied hallucinations and delusions. His

speech was logical, coherent, goal-directed and free of loose associations and perceptual distortions. His mood was normal, affect was congruent. Plaintiff reported feeling some depression and symptoms of volatile anxiety associated with his transfer to WRDCC (Western R&D Correctional Center in St. Joseph).

On March 13, 2007, plaintiff saw Dr. Jay Barone and reported having heard voices (Tr. at 248). Plaintiff was noted to have good hygiene and grooming. He was alert and oriented, his memory was normal. Plaintiff asked if he could try an antipsychotic drug. He was prescribed Doxepin (an antidepressant), Trihexyphenidyl (used to treat the symptoms of Parkinson's disease and tremors caused by other medical problems or drugs), and Perphenazine (an antipsychotic).

On March 26, 2007, plaintiff was alert, interactive, and responsive (Tr. at 249). No symptoms of dysfunction were observed.

On April 12, 2007, plaintiff stated that he was able to complete activities of daily living (Tr. at 250-252). He reported a depressed and anxious mood but no recent changes. He described his depression as off and on. Plaintiff denied presence of anxiety or stress and denied unusual levels of stress or worry. He said he was having thoughts of hurting others. The only medication side effect he reported was dry mouth. He had noticed no changes in his auditory hallucinations. Plaintiff asked for a prescription for Prolixin (treats schizophrenia). The nurse said she would inform Dr. Barone of plaintiff's request.

On April 17, 2007, plaintiff saw Dr. Samuel Hucke (Tr. at 269-271). His chief complaint was, "the voices are coming back." Plaintiff's appetite and sleep were fine, his energy level was appropriate, his mood was stable, his cognitive ability was intact, he was able to control and direct his thoughts, insight and judgment were fair. He was assessed a GAF of 45 and his Perphenazine dose was increased.

On May 15, 2007, plaintiff saw Dr. Barone and reported doing "OK" (Tr. at 253-254). He requested Vistaril to help him sleep and said he was not hearing voices. Dr. Barone observed that plaintiff was calm, his flow of thought was logical, he had no signs of mania or psychosis, he had no sign of anger or harm and plaintiff said he was no longer having thoughts of harming others. Dr. Barone assessed polysubstance abuse, mood disorder not otherwise specified, and psychosis not otherwise specified with a GAF of 67. He refilled plaintiff's medications. "The patient would like to get back the Vistaril and I will do that for him."

On July 12, 2007, plaintiff had a follow up with Dr. Samuel Hucke (Tr. at 254-256). He reported that his stomach had been a little upset but he did not want to stop his medication. He reported that his sleep was fine, his appetite was fine, his energy level was fine, his mood was appropriate and stable, his anxiety was controlled. His cognitive ability was intact, his thoughts were controlled and goal directed, reality testing was intact, he had no hallucinations or delusions. Dr. Hucke assessed mood disorder not otherwise specified and polysubstance abuse.

About a month later, on August 9, 2007, plaintiff saw a nurse and reported difficulty sleeping (Tr. at 256-258). His energy level was adequate -- he was able to complete activities of daily living and "attend and function at school/work." He reported no depression but was experiencing anxiety. Plaintiff said he was satisfied with his medication and was having no side effects. Plaintiff was encouraged to use relaxation techniques. He was also encouraged to participate in counseling and groups while at the prison.

On September 6, 2007, plaintiff saw Dr. Hucke for a psychiatric follow up (Tr. at 259-260). Plaintiff reported trouble sleeping. His appetite was fine, his energy level was fine, his cognitive ability was intact, his thoughts were controlled and goal directed, reality testing was intact, he was having no hallucinations or delusions. He reported feeling anxious and

depressed. Dr. Hucke assessed mood disorder not otherwise specified and assigned a GAF of 50. He decreased plaintiff's Remeron and prescribed Trazodone (antidepressant). He continued plaintiff on Vistaril, Doxepin and Perphenazine.

On October 4, 2007, plaintiff saw Dr. Hucke for a follow up (Tr. at 261-262). Plaintiff's chief complaint was, "I feel more depressed. I guess I need the Remeron back." Plaintiff's appetite was normal, energy level was normal, cognitive ability was normal, thought processes were controlled and goal directed, reality testing was intact, he reported no hallucinations or delusions. Dr. Hucke assessed depressive disorder not otherwise specified and assigned a GAF of 50. He discontinued Doxepin and prescribed Remeron, Trazodone, Vistaril, and Perphenazine.

On November 19, 2007, plaintiff saw Kenneth Hines, a medical technician (Tr. at 262). Plaintiff was cooperative and showed no signs of major mental illness He was having no hallucinations or delusions. Plaintiff said he was satisfied with his current medication regimen. Mr. Hines concluded that plaintiff's current medications "appear sufficient. No referral required at this time."

Four days later, on November 23, 2007, plaintiff saw Dr. Hucke for a follow up (Tr. at 262-263). His chief complaint was, "the holidays are rough." Plaintiff's appetite and sleep were adequate, his energy level was adequate, cognitive ability intact, thoughts controlled and goal directed, reality testing was intact. He was having no hallucinations or delusions. His judgment was fair, he was "mildly depressed." Plaintiff indicated he was satisfied with his current medications. Dr. Hucke assessed depressive disorder not otherwise specified. He told plaintiff to return to the clinic in three months.

On January 24, 2008, plaintiff saw Dr. Hucke for a follow up (Tr. at 264). His chief complaint was listed as, "I'm ok. I have a year to go." Plaintiff's sleep and appetite were

normal, energy level normal, mood normal and stable, anxiety controlled, cognitive ability intact, thoughts controlled and goal directed, reality testing was intact, he was having no hallucinations or delusions. His judgment and insight were fair. Plaintiff expressed satisfaction with his current medications. Dr. Hucke assessed mood disorder not otherwise specified. He continued plaintiff on his same medications and told him to return in two months.

On March 20, 2008, plaintiff saw Dr. Hucke for a follow up (Tr. at 266-267). Plaintiff reported that he was sleeping fine but was feeling depressed during the day. His energy level was normal; his thoughts, cognitive ability, and reality testing were normal; he had no hallucinations or delusions. Insight and judgment were fair. He was satisfied with his current medication. Dr. Hucke assessed mood disorder not otherwise specified and cannabis dependence with a GAF of 50. He prescribed Celexa, an antidepressant, which was added to all of plaintiff's other medications.

On April 3, 2008, plaintiff saw Dr. Hucke and said he felt better on the Celexa (Tr. at 268-269). Plaintiff's appetite and sleep were normal, energy level was normal, mood was appropriate and stable, anxiety was controlled, cognitive ability intact, thoughts were controlled and goal directed, reality testing was intact, he was having no hallucinations or delusions, insight and judgment were fair. Dr. Hucke assessed mood disorder not otherwise specified with a GAF of 60. He continued plaintiff's medications.

Twelve days later, on April 15, 2008, plaintiff saw Kenneth Hines, a medical technician, and said that his "voices pill" worked for a while but then it quit and the voices are back (Tr. at 269).

On April 17, 2008, plaintiff saw Dr. Hucke (Tr. at 269-271). He reported that "the voices are coming back." His appetite, sleep, energy level, mood, anxiety level, cognitive

14

ability, and thoughts were all normal. Dr. Hucke assessed mood disorder not otherwise specified with psychotic features and assessed a GAF of 45. He increased plaintiff's Perphenazine and continued the other medications.

On May 9, 2008, plaintiff saw Kenneth Hines and had no complaints. "No indications of major mental illness were noted and delusions/hallucinations were absent.

On June 6, 2008, plaintiff saw Crystal Bekham, a medical technician (Tr. at 271-272). Plaintiff denied any problems, said his mood had been up and down but mostly up. He was able to manage his "downs" with Celexa. "He stated he copes by exercising and getting outside as often as possible. He stated 'things are pretty normal' and denied concerns or problems". His mental symptoms were all observed to be normal, and plaintiff denied hallucinations or delusions.

On June 27, 2008, plaintiff saw Hope Heller, a medical technician (Tr. at 272). She observed that all of his mental symptoms were normal. His mood was normal, he denied any problems, hallucinations and delusions were not present, thought processes were logical and goal directed.

On July 15, 2008, plaintiff saw Hope Heller (Tr. at 273). He reported uncontrolled crying and shaking. His mental status exam was normal. He was alert, coherent and well oriented, his speech was normal, mood was appropriate, affect was congruent, there was no evidence of hallucinations or delusions, thought processes were normal.

On July 17, 2008, plaintiff saw Dr. Hucke (Tr. at 274-275). He reported that his depression was worse. His appetite, sleep, energy level, cognitive ability, thoughts, and reality testing were normal. His anxiety was controlled and he had no hallucinations or delusions. Dr. Hucke assessed mood disorder not otherwise specified with a GAF of 55. He added Citalopram (an SSRI used to treat depression) to plaintiff's medication regimen.

On September 11, 2008, plaintiff saw Dr. Hucke and said he felt better (Tr. at 275-276). His appetite, sleep, energy level, mood, anxiety, cognitive ability, thoughts, and reality testing were normal. He was having no hallucinations or delusions. Insight and judgment were fair. Dr. Hucke assessed mood disorder not otherwise specified with a GAF of 60.

On September 19, 2008, plaintiff saw Dian Banks, a medical technician, and reported that his medication was working (Tr. at 277). He was sleeping well, and he was "getting himself ready to go home" in four months. His mental status exam was normal -- he was alert, coherent, well oriented; his mood was euthymic, affect congruent, thought processes logical, linear, and goal-directed. His thought content reflected interaction, reality testing was intact, there was no indication of hallucinations, delusions or mania. Plaintiff denied suicidal or homicidal ideation, intent or plan.

Eleven days later, on October 1, 2008, plaintiff saw Dian Banks and reported anxiety, stress, depression and hearing voices (Tr. at 277-278). Plaintiff was alert and oriented times four, his mental state exam was normal. He was alert, coherent, well oriented. His speech was normal, mood appropriate, affect congruent. Ms. Banks observed no evidence of hallucinations or delusions. His thought processes were logical, linear and goal directed. Thought content reflected interaction.

On November 25, 2008, plaintiff saw Dian Banks (Tr. at 278-279). He said his medication was working, he was reading and doing things to stay busy. His mental status exam was normal. He was alert, coherent, and well oriented; his mood was euthymic; his affect was congruent; his thought processes were logical, linear and goal directed; his thought content reflected interaction; reality testing was intact; and there was no indication of hallucinations or delusions. No mental health symptoms were observed.

On December 4, 2008, plaintiff saw Dr. Hucke (Tr. at 279-280). Under chief complaint is written, "I'm getting out." Plaintiff's appetite, sleep, energy level, mood, anxiety, cognitive ability, thoughts, and reality testing were normal. He reported no hallucinations or delusions. Plaintiff expressed satisfaction with his medication. Dr. Hucke assessed mood disorder not otherwise specified with a GAF of 60.

On January 2, 2009, plaintiff saw Dr. Hucke (Tr. at 280-281). Under chief complaint is written, "I'm going home." Upcoming stressors included "release pending." Plaintiff's appetite, sleep, energy level, mood, anxiety, cognitive ability, thoughts, and reality testing were normal. There were no reports of hallucinations or delusions. His judgment and insight were fair. Dr. Hucke assessed mood disorder not otherwise specified with a GAF of 60.

On January 19, 2009, plaintiff saw Dian Banks (Tr. at 281-282). Plaintiff was scheduled to be released from prison in five days. His mental status exam was normal. He was alert, coherent, well oriented; his affect was congruent; his thought process was logical, linear, and goal directed; his thought content reflected interaction; reality testing was intact with no indication of hallucinations or delusions.

On April 29, 2009, plaintiff was seen at the Kitchen Clinic for medical refills (Tr. at 330). He reported having emphysema but he continued to smoke.

> Meds he wants to be on - perphenazine, citalopram, hydroxizine, alprazolam[6] → off x 4 days - on it for 5 years! Mirtazapine, trazodone, [and asthma medications]. At Victory Trade School - culinary. Multiple issues: (1) hears voices, Abilify, Seroquel, Haldol hasn't helped. Does well on low dose perphenazine. Depression/anxiety, (2) COPD - wants to quit smoking, cessation materials discussed. (3) GERD. (4) Needs glasses.

(dosages omitted).

Prescriptions were written, and plaintiff was given "directions for Xanax taper".

---

[6]Alprazolam is the generic form of Xanax and is a controlled substance. Plaintiff's prison records do not reflect prescriptions for this anxiety medication.

On June 4, 2009, plaintiff applied for disability benefits.

On June 9, 2009, plaintiff went to the Kitchen Clinic and reported that he had no refills on his medications (Tr. at 329). He asked for refills which were provided.[7]

Two days later, on June 11, 2009, plaintiff saw Adam Batchelder, a therapist, at the Kitchen Clinic for an initial evaluation (Tr. at 326-328). "He complains that his most recent visit with his Kitchen Clinic medical provider resulted in all of his previously prescribed medications being discontinued. He complains that his most recently prescribed medications have not been working as well as his previous medications." Plaintiff complained of difficulty sleeping and said his anxiety and depression were a result of his coming to terms with the loss of his girl friend and her children. He reported visual hallucinations of people's faces melting. "He reports that he has been working the 12-step program and that he is doing well within it. He is hopeful that a medication adjustment will improve his current symptoms."

> Pt. noted that he is currently on parole and must check in with his parole officer each week. He also reports being unemployed and having no place to live after his current program is complete. He further reports that his medications are not providing relief as the previously prescribed medications did. He also reports that he is currently out of his most recently prescribed medications.
>
> Pt. reported that he is maintaining his current status of being clean from alcohol by attending multiple groups through the week.
>
> Pt. reported that his anxiety, depression, sleep disturbance, hallucinations and delusions have increased since his most recent medication change.
>
> Pt is currently obtaining services within a 12-step residential program. During this appointment he was provided the "Improving Sleep Through Behavioral Change" handout and it was briefly reviewed.

Mr. Batchelder performed a mental status exam and found that plaintiff was oriented times four. He showed adequate concentration and attention and his memory was intact. His

---

[7]There is no indication of what medications were refilled or for how long. The question, "Can we refill?" was answered on the form with, "Yes."

thought processes were normal, speech was within normal limits.  He had adequate hygiene, was dressed appropriately.  Plaintiff's responses to a questionnaire indicated "severe anxiety."  Plaintiff denied any past attempts at suicide.

Mr. Batchelder assessed anxiety disorder not otherwise specified, psychotic disorder not otherwise specified, problems with employment and housing, and a GAF of 40.  Plaintiff was directed to obtain refills of his medications and take as prescribed, review the sleep handout, and "take 3 long walks this week to manage anxiety and depression."

On June 28, 2009, plaintiff was seen at the Kitchen Clinic (Tr. at 481).  His chief complaint was, "Pt stating he is here for med to be changed."  Plaintiff "wants Xanax."  Xanax is a controlled substance used to treat anxiety.  Plaintiff's Trazodone and Celexa doses were increased, his perphenazine was refilled, and the doctor indicated he would consider switching to Effexor if necessary.  There is no indication that plaintiff was given a prescription for Xanax.

On July 29, 2009, Lester Bland, Psy.D., a non-examining agency psychologist, reviewed plaintiff's file and attempted to complete a Psychiatric Review Technique (Tr. at 331-341).  He made no assessments, but wrote the following:

> Claimant reported mood disorder, depression, anxiety and emphysema. He reports hearing voices.
>
> Claimant was in prison and received treatment for his mental impairments such as Prozac, Elavil, and Xanax.[8]  Medical records cover 2006 to 2009, mental status 1/19/09 shows alert, coherent, well oriented, affect congruent, thought process logical, linear, goal directed, thought content reflected interaction.  Reality testing intact, no indication of hallucination, delusion or mania. DX: mood disorder NOS.
>
> Kitchen Clinic records show pt is currently obtaining services within a 12-step residential program. GAF 40.  However presented with adequate concentration and memory.

---

[8]When plaintiff was first incarcerated he reported taking Xanax, but his Xanax was changed to Vistaril.  There is no evidence that he was prescribed Xanax at any time during his incarceration.

Claimant did not provide the ADL information in regards to current functioning.

6/11/09 ADL sent 6/25/09 f/u ADL sent, 7/6/09 ADL expired but he had since obtained an attorney. Attorney ADL sent 7/17/09, ATTY ADL f/u letter sent.

Still no response.

Insufficient due to failure to cooperate.

On January 5, 2010, plaintiff went to the Kitchen Clinic for refills -- he said he had been out of his medication for the past one to two months "at least" (Tr. at 348). His medications were refilled.

Thirteen days later, on January 18, 2010, plaintiff went to the Kitchen Clinic and requested a letter from the doctor stating that he is disabled and unable to work (Tr. at 346-347). The letter was for his parole officer.

> Pt. reported that he has been on parole 1 yr and is required to check in with a counselor. He stated he tried a previous counselor at the clinic, but did not get along with him, so now he is trying it out with the new BHC. He would like to move out of his current living situation due to relationship difficulties, but fears that will make him seem unstable to PO (he has moved a few times in last few months). Pt states it helps him to call his Mom and Dad to be reassured they will not abandon him (the voices tell him they will). Pt stated he is unable to work due to mental illness symptoms and requested "excuse" for his PO. This request will be forwarded to doctor. Pt reported 2 previous suicide attempts and feels that God intervened.[9]

Plaintiff said his medication had reduced the number of times he hears voices from about 40 to 10 times per week. He reported his depression was getting worse and he was having more thoughts of harming himself. He reported the Trazodone was helping him with sleep, "but he is getting 'too used to it.'" His antidepressant was helping him.

On exam, plaintiff was oriented times four. He showed adequate concentration and attention and he exhibited no indications of memory loss or limitations. He was somewhat anxious and avoided eye contact at times. His thought processes were normal and speech was

---

[9]On June 11, 2009, plaintiff had told Adam Batchelder, a therapist at the Kitchen Clinic, that he had never attempted suicide.

within normal limits.  He had adequate hygiene, and was dressed appropriately.

On February 1, 2010, plaintiff saw Shelley Harvill, M.A., at the Kitchen Clinic (Tr. at

343).

> At this time he feels unstable and doesn't know what he wants beyond getting off probation.  He reported mixed up feelings inside and increased depression. Although he knows he would feel better about himself if he were working he doesn't think he can keep a job at the present time.  He is unhappy with current relationship (she is too old for me) but feels trapped b/c of probation requirements.
>
> Progress toward treatment recs: Pt would like diagnostic clarification so he can better understand what is going on with him and to help his disability case. . . .  Pt reported that his only problem is that his current PO will not waive his fees, which he is unable to pay.  He is filing for disability, but his PO needs something now saying he is unable to work.

Plaintiff was oriented to person, place, time and situation. He showed adequate

concentration and attention and he exhibited no indications of memory loss or limitations. His

thought processes were normal, he had adequate hygiene, and he was dressed appropriately.

Plaintiff was told to continue on his medications and therapy was recommended.

On April 20, 2010, plaintiff was seen at the Forest Institute for a diagnostic clarification

of "mood disorder" after having been referred by the Kitchen Clinic (Tr. at 365-372, 514-

521).  "Mr. Logsdon . . . is unemployed and seeking Social Security Income (SSI) and intends to

provide the evaluation to his attorney to obtain SSI."

Plaintiff reported experiencing a feeling of being on top of the world for 10 to 60

minutes two or three times a day, then he drops for about 45 minutes to the extent he is unable

to get out of bed and experiences paranoia and anxiety.  Voices yell at him and tell him he is no

good.  He does not eat any food cooked by his roommate or in restaurants because he does not

trust people.  He believes people are trying to control his thoughts and send him messages.  He

believes when he drinks water he must "take 8 drinks".  He checks his locks four times to make

sure they are locked.  He washes his hands four times, he rinses and dries each plate four

times.  When he eats food he makes sure the last bite is the 8th bite.  Plaintiff reported these symptoms had been present since childhood and/or his early 20s.

Plaintiff reported having lost previous jobs for failing to show up for work too many times and for getting into a verbal disagreement with a lesbian co-worker.  Plaintiff described "current memory difficulties" and said he believes those were caused by "an incident in Texas".  He reported having tried to kill himself twice in the past.  Plaintiff was unable to finish testing due to alleged paranoia.  He appeared angry during discussions of various doctors removing him from medications.

His thought content and process were "slightly disorganized."  Plaintiff tested in the "extremely low" range of intelligence which is inconsistent with the findings of the psychiatrist when plaintiff was in prison and noted to be "intelligent and well articulate."  Although plaintiff's immediate memory appeared intact, he claimed to be unable to recall any of three words when delayed verbal recall was tested.  After testing resulted in "extremely low" results, Ms. Courtney noted that "it is difficulty to determine whether he falls in this range due to brain injury, psychosis, or he has been in this range since childhood.  It is important to complete further evaluation".  Plaintiff's "extremely low" results were in the categories of immediate memory, language, visuospatial/constructional, and delayed memory, many of those scores being so low that they were described as "extremely low range with less than 1% of the population."

On the Minnesota Multiphasic Personality Inventory - 2, it was determined that plaintiff "over reported or exaggerated his difficulties to the extent that the test is uninterruptible [sic] on both occasions."  On the Data Interpretation in Regard to Structured Inventory of Malingering, plaintiff's test score was "significantly elevated."

Plaintiff received a full scale IQ of 55 which placed him in the 0.1% percentile.

When discussing all the test results, Ms. Courtney wrote, "although the outcomes are inconsistent, this may be representative of the interference of psychotic processes which appeared throughout the evaluation, for example, the client indicated he would need the intern to send his 'exrays' to his attorney. Mr. Logsdon's scores on memory are consistent with scores of less than one percent of the normative test-takers. It is vital that Mr. Logsdon be further tested for diagnostic clarification." Ms. Courtney noted, "The client is seeking disability and diagnostic clarification for medication. He repeatedly requests a note to prove that he is disabled and unable to work." Ms. Courtney assessed mood disorder not otherwise specified, cognitive disorder not otherwise specified, paranoid and antisocial traits, possible open head injury on two occasions per client report, problems related to social environment, financial difficulties, employment difficulties, and a GAF of 50.

"The client reports experiencing hallucinations, delusions and paranoid ideation; however, due to the invalid results and limited data available beyond self-report, it is difficult to determine the nature of these symptoms. . . . Although the client over reported and elevated the malingering scales, he presents as consistently disorganized and urgent." The Forest Institute, where this testing occurred, is a training clinic for masters and doctoral graduate students of clinical psychology. Ms. Courtney was an intern with a master's degree (Tr. at 365, 370, 372, 490).

On June 3, 2010, plaintiff called Ms. Courtney to provide her additional information -- his roommate kicked him out "for attempting to rob himself" (Tr. at 490). He inquired about whether the report was done.

On August 16, 2010, plaintiff was seen at the Kitchen Clinic for cold symptoms (Tr. at 501).

On August 24, 2010, plaintiff was scheduled to see Dustin Brown, a therapist at the Kitchen Clinic (Tr. at 499). He failed to show and did not call to cancel.

On September 2, 2010, plaintiff was scheduled to see Barbara Farrell, a therapist at the Kitchen Clinic (Tr. at 498). He failed to show and did not call to cancel.

On October 14, 2010, plaintiff told his doctor at the Kitchen Clinic that he had been suffering memory loss for two years (which is about nine months after his alleged onset date) (Tr. at 497). He also has experienced long-term memory loss since about age 14. The doctor recommended an MRI.

On October 22, 2010, plaintiff had an MRI of his brain due to complaints of memory loss (Tr. at 496). His scan was normal.

On January 4, 2011, plaintiff was seen by a doctor at the Kitchen Clinic (Tr. at 528). He came to get a flu shot, and he complained of headaches. Plaintiff said he could not take nonsteroidal anti-inflammatories or over-the-counter Tylenol due to stomach upset. He also listed other medications he had tried without success. Plaintiff's exam was normal; his gait was observed to be normal. He was prescribed cyclobenzaprine (a muscle relaxer also known as Flexeril).

On January 15, 2011, plaintiff was seen by a nurse practitioner at the Kitchen Clinic (Tr. at 527). He continued to smoke. He was not working, was getting food stamps. Plaintiff's "enjoyable activities" included walking and reading. Plaintiff was observed to smell of tobacco. Plaintiff reported sleeping well on Trazodone. He complained of headaches and fatigue. It was too early to refill plaintiff's medication.

On February 25, 2011, plaintiff saw Janie Vestal, M.D., at the Kitchen Clinic (Tr. at 526). Plaintiff reported he stopped smoking five days ago. This is the only medical record in the file in which plaintiff claimed to be a non-smoker. Plaintiff indicated he had been off his

Seroquel for "some time." Plaintiff said he was sleeping poorly, was stressed out, depressed, anxious, and was still hearing voices. Dr. Vestal observed that plaintiff's breathing was unlabored. Plaintiff brought disability forms for Dr. Vestal to complete. Dr. Vestal completed a "medical statement regarding chronic obstructive pulmonary disease for Social Security disability claim where smoking is an issue" (Tr. at 523-524). She indicated that plaintiff was no longer smoking. To the questions, "Can the patient reduce his or her future/present disability by stopping smoking?" she answered, "Yes." She found that plaintiff could stand for 30 minutes at a time, sit for 60 minutes at a time, lift 10 pounds occasionally, lift no weight frequently, and could not tolerate dust, smoke or fumes. She found that plaintiff can work no hours per day. She also completed a Medical Source Statement - Mental (Tr. at 532-533). She found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

She found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to respond appropriately to changes in the work setting

25

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

She found that plaintiff was markedly limited in the following:

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to set realistic goals or make plans independently of others

She found that plaintiff was extremely limited in the following:

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

On March 10, 2011, plaintiff saw Nick Wilson, a therapist at the Kitchen Clinic (Tr. at 536). Plaintiff reported shaking so violently due to anxiety that he was unable to pour a glass of juice. "Pt was oriented to person, place, time, and situation. He showed adequate concentration and attention and exhibited no indications of memory loss or limitations during this visit." His thought processes and speech were normal. He had adequate hygiene, and was dressed appropriately. Plaintiff was told to continue taking his medications as directed and he was given an audio CD with guided progressive relaxation techniques.

On April 20, 2011, plaintiff was seen at the Kitchen Clinic for medication refill and cold symptoms (Tr. at 535). He continued to smoke. Plaintiff was told to stop smoking.

On June 14, 2011, Administrative Law Judge David Fromme sent a letter to Dr. Vestal (Tr. at 539-541). The letter states in part as follows:

Mr. Logsdon applied for Social Security disability benefits, and his application is pending in my office. We received a "Mental Medical Source Statement - Mental" that you filled out dated February 25, 2011. . . . In it you indicated that Mr. Logsdon was unable to perform certain tasks or mental functions. We have been unable to understand the basis for your assessment in the check-mark form and must request additional information and clarification of the form.

The basis for your opinions is important in the evaluation of the evidence in Mr. Logsdon's case. Would you please, below this paragraph, on the enclosed copy of this letter, provide the following information:

1.    Have you administered any psychometric or other tests, examinations or measurements to Mr. Logsdon? Yes _____ No _____

2.    If your answer is "Yes," what tests, examinations or measurements did you administer, and when? Please provide a copy with your response.

3.    In the form, you indicated that Mr. Logsdon was "Moderately" limited in the areas of "Understanding and Memory."

      Are there specific clinical observations such as clinical signs or findings, or measurements, such as test results that you have made, on which you rely for such opinions in the Medical Source Statement - Mental? Yes _____ No _____

      If so, please state what clinical observations, signs, findings, measurements or test results you relied on *and how they tend to indicate the conclusions you have expressed.*

      If no, what was the basis for your opinion?

4.    In the form, you indicated that Mr. Logsdon was "Moderately" or "Markedly" limited in areas of "Sustaining Concentration and Persistence."

      Are there specific clinical observations such as clinical signs or findings, or measurements, such as test results which you have made, on which you rely for such opinions in the Medical Source Statement - Mental? Yes _____ No _____

      If so, please state what clinical observations, signs, findings, measurements or test results you relied on *and how they tend to indicate the conclusions you have expressed*.

      If not, what was the basis for your opinion?

5.    In the form, you indicated that Mr. Logsdon was "Moderately" and "Markedly" limited in areas of "Social Interaction."

Are there specific clinical observations such as clinical signs or findings, or measurements, such as test results which you have made, on which you rely for such opinions in the Medical Source Statement - Mental? Yes _____ No _____

If so, please state what clinical observations, signs, findings, measurements or test results you relied on *and how they tend to indicate the conclusions you have expressed*.

If not, what was the basis for your opinion?

[6]. In the form, you indicated that Mr. Logsdon was "Moderately" or "Markedly" limited as to "Adaptation".

Are there specific clinical observations such as clinical signs or findings, or measurements, such as test results which you have made, on which you rely for such opinions in the Medical Source Statement - Mental? Yes _____ No _____

If so, please state what clinical observations, signs, findings, measurements or test results you relied on *and how they tend to indicate the conclusions you have expressed*.

If not, what was the basis for your opinion?

Dr. Vestal did not complete the form. She wrote the following at the top:

Dear Judge Fromme,

I believe your questions will be best addressed by the diagnostic assessment performed at the Forest Institute's Murney Clinic 4-20-10.

Janie Vestal, M.D.

(Tr. at 539). The diagnostic assessment from the Forest Institute was performed by an intern.

On June 15, 2011, after the administrative hearing had been conducted, Frances Anderson, Psy. D., completed a psychological evaluation at the request of Disability Determinations (Tr. at 545-549). Plaintiff arrived on time after having taken the bus, and he had an active driver's license which he used for identification.

He was able to provide adequate information regarding his own case history and current functioning. The information and clinical presentation of the claimant as well as medical records indicated inconsistencies. It was interesting to observe that the claimant would sometimes whisper (such that he could be clearly heard) a correct

response to a mental status item or to items from the WAIS-IV, then pause and verbalize an incorrect response, denying his initial whispered correct response.

. . . He described his sleep as "sleep 3-5 hours," . . . . However, later he stated he sleeps 9-10 hours, approximately three nights per week. He also noted his prescribed Trazodone facilitated sleep. . . .

Findings regarding his intellectual functioning are inconsistent. While in the 7th grade, he achieved a VIQ of 80, PIQ of 81 and FSIQ of 79, placing him in the Low Average/borderline range of intelligence. Then in 4/10, though he "appeared to be of Low Average intellectual functioning, when he was administered the WAIS IV, he achieved a FSIQ of 55, VCI of 61, PRI of 63, WMI of 66 and PSI of 56 [this refers to the testing done at the Forest Institute]. . . .

He does not perceive he can work, as "I have difficulty understanding directions, difficulty keeping mind on one thing at a time, have side effects from medication - drowsy, throwing up, stomach aches when stressed out. Don't feel like I would be safe around machinery in factory." . . .

The claimant is married to his 47 year old wife who is unemployed. . . .

. . . The claimant is currently unemployed, having last worked six years ago, prior to his last prison term. He described previous employments as having worked in maintenance for "few months," at a grocery store for a "few months" and at PSF for seven months. Reportedly, he was able to adequately manage previous job expectations. He reportedly was fired from four employments, for "threats, couldn't understand jobs."

The claimant is able to perform self-care, including dressing and bathing, and takes his medications as prescribed. While living in the Missouri Hotel, his wife does any laundry and household cleaning. He can use the telephone and drive a car. He reads the newspaper or magazines, as well as manages his money and pays his bills. He reportedly can perform his daily activities without assistance and in a timely manner. He spends some social contact with his wife and other residents. He arises and retires at times corresponding to scheduled events in the residence in which he lives. On a typical day, he [will] "walk a little, watch TV," participate in required classes, talk with a counselor and "mostly stay in my residence".

There was a question as to whether he was putting forth his best effort throughout the evaluation. Thus, he was administered the Rey's 15 Item Test.[10] He correctly

---

A       B       C       [10]The Rey's 15-item test is a card with 15 items, although many are
1       2       3       repeated. The patient has 30 seconds to review it, and then 2 minutes to
a       b       c       recall as many items as possible without regard to order. Fewer than 9 items
                        recalled suggests malingering.
○       □       △

I       II      III

reproduced 3 of 15 characters, stating "just can't remember what I saw." This finding is inconsistent and unexplainable.

Plaintiff's IQ was tested and he achieved a full scale IQ of 68. This placed him in the high end of the Mildly Mentally Retarded range of intelligence. Comparing these scores to the scores achieved at the Forest Institute, Dr. Anderson noted that this "raises the question of inconsistency." Plaintiff was dressed appropriately, his grooming and personal hygiene were appropriate, he smiled appropriately, eye contact was adequate, he was alert, gait and coordination were adequate, motor movements were minimal. "The claimant generally sat quietly throughout the evaluation. There were no unusual gestures or mannerisms noted." Plaintiff was logical and coherent, relevant and goal directed. He was able to comprehend questions without difficulty, "not seeming to have any difficulty in expressing himself, as he chose to do so."

> As noted previously it was interesting to observe the claimant would sometimes whisper, (such that he could be clearly heard), a correct response to a mental status item or to items from the WAIS IV, then pause and verbalize an incorrect response, denying his initial whispered correct response. He was sometimes slow to respond to items. On two occasions, he whispered loudly "this is starting to frustrate me" as completing mental status and WAIS IV items. He appeared to be in no acute emotional distress. His affective responses were within the normal range, and consistent with the content of the conversation. . . .
>
> He was adequately oriented to time, place, person and purpose. There was no evidence of a thought disorder, with thought process and content appearing normal. He denied suicidal ideation. Memory functions were generally adequate. . . .
>
> . . . He reportedly has been intermittently treated for depression and anxiety, though medical records indicated he primarily carries "rule out diagnoses." . . . It was also interesting to note inconsistencies with his clinical presentation, symptom description and history, self described functioning, etc. There was question as to whether he was putting forth his best effort throughout the evaluation. . . . Performance on the mental status exam indicated some adequate functioning, with memory functions generally adequate. . . .
>
> It would appear the claimant can understand and remember at least simple instructions without difficulty. His ability to sustain concentration, pace and persistence would appear to be adequate, for at least simple tasks. His ability to socially interact would

appear adequate, though he would likely do better with limited public contact. His ability to adapt would also appear adequate.

It would appear the claimant could manage his finances in an independent, responsible fashion, as he reportedly is currently doing.

Dr. Anderson assessed mild mental retardation to borderline intellectual functioning, antisocial personality traits with a GAF of 65-70. He completed a Medical Source Statement of Ability to do Work-Related Activity (Mental) on July 12, 2011 (Tr. at 550-552). He found that plaintiff had mild limitations in his ability to understand, remember and carry out simple instructions; make judgments on simple work-related decisions; understand and remember complex instructions; interact appropriately with the public, supervisors, and coworkers; and respond appropriately to usual work situations and to changes in a routine work setting. He found that plaintiff had moderate limitations in his ability to carry out complex instructions or to make judgments on complex work-related decisions.

C.    SUMMARY OF TESTIMONY

During the June 13, 2011, hearing, plaintiff testified; and Terri Crawford, a vocational expert, testified at the request of the ALJ.

1.    Plaintiff's testimony.

At the time of the hearing, plaintiff had been living in an apartment with his wife for the past 2 1/2 months (Tr. at 32). Plaintiff's wife does not work (Tr. at 32). For income, plaintiff's wife donates plasma twice a week, and they are not required to pay rent where they live -- it is a place where " couples and parents stay to get back on their feet" (Tr. at 32). Before that plaintiff had lived for a few months on Market Street, and before that at least six months on State Street (Tr. at 32). Plaintiff's meals are provided where he lives, and he does not have to do his own laundry (Tr. at 42). He helps out in the kitchen when they need it by wiping down the tables, making sure the tables are set up correctly, putting salt and pepper

shakers at the backs of the tables, refilling the napkins (Tr. at 42-43). After eating he carries his own dishes up but he is not required to do any dishes or kitchen work to live there (Tr. at 43).

Plaintiff was 45 years of age at the time of the hearing (Tr. at 33). Plaintiff worked as a maintenance man at an apartment complex in 1998 and left that job when he relocated (Tr. at 33-34). Plaintiff had problems doing that job due to his "physical health" and he could not remember how to perform the electrical work (Tr. at 34). Plaintiff does not remember why he left his job as a laborer at Freeport Ship Building (Tr. at 34). Plaintiff worked with livestock in one job, and he worked on an assembly line processing chicken in 2000 (Tr. at 34-35). Plaintiff later went back to the livestock job, first cleaning up the barns and then he was transferred to the packing plant as a meat cutter (Tr. at 36). He got fired from that job because he could not fulfill his duties -- he had a hard time concentrating and was falling behind on the line (Tr. at 36). Plaintiff has not worked since 2006 (Tr. at 37). He stopped working then because he was incarcerated (Tr. at 37).

Plaintiff can only walk for a couple blocks before he has to stop and catch his breath (Tr. at 37). He has to rest for 15 to 25 minutes before he can start walking again (Tr. at 37). Plaintiff can only lift and carry five pounds or he gets short of breath (Tr. at 37-38).

Plaintiff hears voices which tell him that he is no good, that people are after him, that his family does not love him, etc. (Tr. at 38). He hears these voices four or five times a day despite being on medication for this (Tr. at 38). Plaintiff has problems with paranoia and anxiety (Tr. at 38). When asked to give an example, plaintiff said, "While I was working at the hog plant, I got in a verbal argument with a lady that worked there, and she said some things to me that I didn't like, and I got upset at her." (Tr. at 38-39). Plaintiff told her that if she did not leave him alone, she would "get her house blown up" (Tr. at 39). This resulted in his

termination from that job (Tr. at 39). Just prior to this testimony, plaintiff had testified that he got fired from that job because he was unable to keep up on the line due to lack of concentration.

Plaintiff's problems with concentration are caused by his medication (Tr. at 40). When asked to give an example of something he had trouble concentrating on, plaintiff said, "Like when you do a cut, they had me doing two cuts on a roast, and I just couldn't focus on what I was doing. My motor movements were very messed up." (Tr. at 40). He does not watch television because he does not understand the TV and he does not understand the shows (Tr. at 40). Later he testified that he does have a television in his home, and he watches television but not very often (Tr. at 43). He reads novels about two days a week (Tr. at 43).

Plaintiff sometimes has panic attacks during which he feels sweaty and dizzy and he passes out (Tr. at 39). This happens about three times a month (Tr. at 39). Crowds bring this on, or "getting overwhelmed by a certain thing." (Tr. at 39). Plaintiff is comfortable around two or three people (Tr. at 39). Being around more people than that makes him "really paranoid" (Tr. at 39). There were at least four other people in the hearing room at the time of this testimony (Tr. at 30).

Plaintiff has problems with crying spells almost every day (Tr. at 39). He has headaches on a regular basis -- once or twice a day (Tr. at 40). His eyesight gets blurry when he gets a headache (Tr. at 40). It takes about a half an hour for his headache to go away (Tr. at 40).

Plaintiff has a driver's license but not a vehicle (Tr. at 41). He got to the hearing by riding the bus (Tr. at 41). When plaintiff leaves his home, he usually goes to the other side of the building to sit at a picnic table (Tr. at 41). Plaintiff sees his parole officer once a month, and one of his friends will give him a ride or he will walk to the office (Tr. at 42). He does not

know how far the parole office is from where he lives, but he has to leave early in the morning and it takes him four hours to walk there (Tr. at 42).

## 2. Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge. Plaintiff's past work includes maintenance repairer which is a skilled job, painter which is a semi-skilled job, poultry dresser which is unskilled, and farm worker which is semiskilled (Tr. at 44-45).

The first hypothetical involved a person with the limitations as described by plaintiff in his testimony -- such a person could not work (Tr. at 45).

The second hypothetical incorporated the limitations as found by Dr. Vestal in a "Medical statement regarding chronic obstructive pulmonary disease for Social Security disability claim where smoking is an issue" which is found at pages 523-524 of this record (Tr. at 45). The findings include the following: plaintiff can stand for 30 minutes at a time, sit for 60 minutes at a time, lift 10 pounds occasionally and no weight frequently, is unable to tolerate dust, smoke and fumes, and can work "no hours" per day. Such a person could not work (Tr. at 45).

The third hypothetical incorporated the limitations as found by Dr. Vestal in a Medical Source Statement - Mental completed by Dr. Vestal (Tr. at 45). Such a person could not work (Tr. at 45).

The fourth hypothetical involved a person who could stand or walk 6 hours a day; sit for 6 hours a day; lift 20 pounds occasionally and 10 pounds frequently; occasionally bend, stoop or crouch; and should avoid extreme temperature, humidity, dust, fumes, poor ventilation. The person should not have a high stress job (i.e., should not be required to work at a fast pace or meet strict and explicit quotas, deadlines, or schedules) or jobs involving

unusual changes in the work setting. The person could not sustain a high level of concentration such as sustained precision or sustained attention to detail; however, the person could pay attention well enough to carry out a simple routine or simple repetitive tasks. The person cannot have interaction with the public on a personal basis and should not have a job requiring the person to work on a close personal basis with coworkers (Tr. at 45-46). Such a person could not perform any of plaintiff's past work (Tr. at 46). However, the person could perform some light, unskilled work, such as production assembler, D.O.T. 706.687-010, with 54,000 jobs in the country and 750 in Missouri, or office helper, D.O.T. 239.567-010, with 165,000 in the country and 3,200 in Missouri (Tr. at 46). Both jobs are an SVP of 2 (Tr. at 46).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge David Fromme entered his opinion on September 12, 2011 (Tr. at 10-23). Plaintiff's last insured date was September 30, 2009 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since January 31, 2006 (Tr. at 12).

Step two. Plaintiff's severe impairments consist of chronic obstructive pulmonary disease, scoliosis of the thoracic spine, anxiety disorder, personality disorder, antisocial disorder and borderline intellectual functioning (Tr. at 12).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12-15).

Step four. The ALJ found that plaintiff's subjective complaints of disabling symptoms are not credible (Tr. at 19-20).

> Although he testified that he could only walk a couple of blocks before needing to stop and rest for 15 to 25 minutes before walking again, he testified later that he was able to walk for four hours to get to his parole officer's office. The record indicates that the claimant continued to smoke even though he was repeatedly counseled regarding

smoking cessation. His self-reported ability to walk four hours to his parole officer's office and his continued smoking are inconsistent with the claimant's allegations of disabling impairments and symptoms arising from his chronic obstructive pulmonary disease.

AS for the claimant's past work, the record shows that he had generally low earnings prior to his alleged disability onset date. His alleged onset date coincides with his incarceration in the Department of Corrections. All of these issues raise a question as to whether the claimant's continued unemployment is actually due to medical impairments and draws into question the claimant's motivation to work and his credibility as a witness herein.

The claimant reported in a Claimant's Medications form that he was currently taking Vistaril for anxiety, Trazodone for sleep, Seroquel for sleep and "voices", Celexa for depression and Spiriva for breathing problems. There is no evidence that the claimant experiences significant side effects from his medication, or that his medication has been frequently changed or the dosage altered due to side effects. The claimant has not alleged any side effects from the medications he takes and states that his medications are effective.

An Explanation of Determination was completed at the initial level by a Disability Determinations examiner on July 2, 2009. The examiner noted that the claimant had not completed and returned requested information regarding his activities of daily living and it was not possible to determine what functional limitations he had in regard to his physical and mental condition.

(Tr. at 19-20).

Plaintiff retains the residual functional capacity to perform light work except he can sit, stand or walk six hours per day each; lift 20 pounds occasionally and 10 pounds frequently; occasionally bend, stoop, and crouch; should avoid extreme temperature, humidity, dust, fumes and poor ventilation; should not have a high stress job, i.e., he should not be required to work at a fast pace, meet strict and explicit quotas, deadlines or schedules or do jobs involving unusual changes in the work setting. The job should not require a sustained high level of concentration. He is able to pay attention well enough to carry out a simple routine or simple repetitive tasks. He should not have a job requiring interaction with the public or one that requires working with close personal interaction with coworkers (Tr. at 15). With this

residual functional capacity, plaintiff cannot perform his past relevant work as a maintenance repairer, painter helper, poultry dresser, or farm worker (Tr. at 21).

Step five. Plaintiff is capable of performing other jobs available in significant numbers such as production assembler or officer helper (Tr. at 22). Therefore, plaintiff is not disabled (Tr. at 22-23).

## VI.    *WEIGHT GIVEN TO OPINION OF DR. VESTAL*

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Vestal. Interestingly plaintiff only challenges the ALJ's discrediting of Dr. Vestal's opinion as to plaintiff's mental abilities, not of his physical abilities.

Plaintiff specifically argues that Dr. Vestal's opinion -- which in her own words relied on the testing done at the Forest Institute -- was properly supported. Plaintiff argues that the testing was done by psychiatric specialists, when in reality it was performed by an intern. The symptoms reported by plaintiff during this exam were never reported to any treating medical professional and appear completely geared toward bolstering his disability case.

Plaintiff described manic depressive symptoms where he had feelings of being on top of the world and then he would plummet to not wanting to get out of bed. These symptom waves occurred at the unusual rate of 10 to 60 minutes. This is inconsistent with the treatment records from years in the Department of Corrections when plaintiff consistently denied manic symptoms and none were ever observed.

Plaintiff said he does not eat any food cooked by his roommate or in restaurants because he does not trust people. Plaintiff reported for years to his treating doctors that his appetite was fine. He never mentioned an inability to trust what others cook, and after having spent years in the Department of Corrections (after his alleged onset date) he no doubt ate plenty of food that had been cooked by others.

Plaintiff reported that people are trying to control his thoughts and send him messages. He never reported this to any doctor -- not before this visit, not after.

Plaintiff relayed a very elaborate series of even-numbered obsessive compulsive tendencies -- he must drink eight times. He checks his locks four times. He washes his hands four times. He rinses and dries each dish four times. His last bite of food must be the eighth bite. Despite his report to Ms. Courtney that these symptoms had been present since childhood and his early 20s, no one else in this entire record ever heard about these compulsions nor did anyone else ever observe them.

Plaintiff's IQ results were much lower than when he was in school or when he was tested by Dr. Anderson. Valid IQ testing, absent head trauma, does not change so significantly. The plausible explanation is that plaintiff was exaggerating his responses during this test which he openly stated he intended to use "to obtain SSI."

Ms. Courtney noted that plaintiff's immediate memory appeared intact; however, when being tested he claimed to be unable to recall things. Ms. Courtney determined that plaintiff "over reported or exaggerated his difficulties" to the extent the test results were invalid. His malingering scores were "significantly elevated." Yet she did not discuss that but instead relied entirely on plaintiff's subjective reports of his symptoms and his other test results without assessing their validity. She noted that plaintiff was experiencing "psychotic processes" because he referred to test results as x-rays. Plaintiff's test results placing him in the bottom one-tenth of one percent, coupled with the malingering indications and the exaggeration indications apparently did not suggest to Ms. Courtney that plaintiff's subjective complaints and his test responses may not be credible or the least bit reliable.

Plaintiff points to other records which he believes support Dr. Vestal's opinion. For example, he cites to the February 1, 2010, appointment during which he was tearful. During

that appointment, the following was noted: "Pt would like diagnostic clarification so he can better understand what is going on with him and to help his disability case. . . . Pt reported that his only problem is that his current PO [parole officer] will not waive his fees, which he is unable to pay. He is filing for disability, but his PO needs something now saying he is unable to work."

Plaintiff points to an appointment with a counselor during which plaintiff reported seeing hallucinations of faces melting. However, during that appointment, he also noted that he had been out of almost all of his medication.

Dr. Vestal's opinion is completely without foundation. The day she completed this Medical Source Statement Mental, plaintiff indicated he had been off his Seroquel (antipsychotic medication) for quite some time and therefore remained noncompliant with treatment.

On that day, Dr. Vestal also completed a form to evaluate COPD when smoking is a factor, and on this day (and only this day) plaintiff claimed to have quit smoking. On his next medical appointment, he reported that he continued to smoke cigarettes. He was observed by medical professionals to smell of tobacco. Dr. Vestal found that plaintiff could stand for 30 minutes at a time, sit for 60 minutes at a time, lift 10 pounds occasionally, lift no weight frequently, and could not tolerate dust, smoke or fumes. She found that plaintiff can work "no" hours per day.

Plaintiff came to this visit with disability forms, and his sole purpose for seeing Dr. Vestal this day was to have those forms filled out in the hopes of obtaining disability benefits. Dr. Vestal later claimed she relied on the Forest Institute report for her assessed mental limitations; however, it is unclear on what she relied when she found that plaintiff could lift "no weight" frequently and that he could work "no hours" per day. There is nothing in her

records supporting such findings, and there is nothing in any other medical record in this file supporting such findings. In fact, on this day when Dr. Vestal found that plaintiff was so severely limited in his physical and mental abilities, her observations consisted of "anxious, thought processes coherent, neuro system ok, breathing unlabored at rest." No tests were done. Her treatment consisted of giving plaintiff upper back exercises to do, she refilled his Seroquel, she gave him a prescription for 15 Celexa pills (antidepressant), and indicated that she faxed plaintiff's disability paperwork to his attorney.

Plaintiff cites to the record to establish that he had a history of treatment with Dr. Vestal.

❖ The first record he cites, at pages 236-237, is a record from the Department of Corrections, not from Dr. Vestal's office.

❖ The second (page 343) is a record from a therapist at the Kitchen Clinic who observed that plaintiff had adequate concentration (Dr. Vestal found plaintiff moderately limited in his ability to concentrate) and attention, and he exhibited no indication of memory loss or limitation. In that record plaintiff said he wanted to get disability benefits and he wanted to get off parole.

❖ The next record cited by plaintiff (page 344) is a record from the Kitchen Clinic. "Needs/wants more detailed letter for PO in order to have $30.00 intervention fee waived stating he is totally disabled." Plaintiff said he could not work due to emphysema (he continued to smoke) and psychiatric symptoms. Plaintiff did not describe any psychiatric symptoms and none were observed. Under "plan" is written the following: "Please schedule appt to do MSS for disability."

❖ The next record cited by plaintiff (page 347) is for a visit with therapist Shelley Harvill who wrote, "Pt stated he is unable to work due to mental illness sxs and requested 'excuse' for

his PO." Ms. Harvill observed that plaintiff showed adequate concentration and attention and he exhibited no indications of memory loss or limitations. His thought processes were normal and speech was in normal limits. He had adequate hygiene and was dressed appropriately.

❖ The next record cited by plaintiff (page 497) is for a visit with someone at the Kitchen Clinic whose signature is illegible but the first name starts with a B. Plaintiff said he needed to schedule an MRI.

❖ The next record cited by plaintiff (page 527) is for a visit with a nurse practitioner at the Kitchen Clinic. Plaintiff complained of headaches but said his enjoyable activities include walking and reading. Plaintiff smelled of tobacco. The nurse practitioner wrote, "psychiatric illness?" Plaintiff also asked about his disability paperwork.

❖ The final record cited by plaintiff (page 536) is a record of therapist Nick Wilson at the Kitchen Clinic. Plaintiff reported shaking so violently that he could not pour a glass of juice. Plaintiff never complained of this symptom to anyone else, and no one ever observed plaintiff shaking as described. Mr. Wilson observed that plaintiff was oriented times four, he showed adequate concentration and attention, he exhibited no indications of memory loss or limitation, his thought processes and speech were normal, he had adequate hygiene, he was dressed appropriately. His mood was "down", otherwise all observations were normal. He gave plaintiff a CD on relaxation and told him to read a sleep handout and continue taking his medications.

Plaintiff does not cite pages 345 and 346 which are Kitchen Clinic records of plaintiff again requesting a note for his parole officer saying he is disabled and unable to work.

A claimant's residual functional capacity is the most he can do despite the combined effect of his credible limitations. 20 C.F.R. §§ 404.1545 and 419.945. It is the claimant's burden to prove his residual functional capacity, and it is the ALJ's responsibility to determine

the residual functional capacity based on all relevant evidence in the record.  <u>Harris v. Barnhart</u>, 356 F.3d 926, 930 (8th Cir. 2004); <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000).  The ALJ determines a claimant's residual functional capacity by considering the claimant's symptoms and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529 and 416.929.  In this case, the ALJ found plaintiff's subjective statements regarding his limitations to be less than credible, a finding plaintiff does not challenge in this appeal and one which I find to be supported by the substantial evidence in the record.  Additionally, plaintiff remained noncompliant with his psychiatric treatment as late as February 25, 2011, when he told Dr. Vestal he had been off his Seroquel for "quite some time."  This was more than five years after plaintiff's alleged onset date.

The ALJ's residual functional capacity assessment is supported by the credible evidence in the record, including plaintiff's exam by Dr. Anderson and his treatment records, especially records of treatment sought for symptoms rather than in connection with his disability case.

## VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 22, 2014